**Certiorari Granted, March 23, 2011, No. 32,844**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: 2011-NMCA-025

Filing Date: January 10, 2011

Docket No. 29,629

JESUS GONZALEZ,

       Worker-Appellant,

v.

PERFORMANCE PAINTING, INC.
and BUILDERS TRUST OF NEW
MEXICO,

       Employer/Insurer-Appellees.

APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION
Terry S. Kramer, Workers' Compensation Judge

James Rawley
Albuquerque, NM

for Appellant

Miller Stratvert P.A.
Thomas R. Mack
Nathan A. Cobb
Albuquerque, NM

for Appellees

**OPINION**

**SUTIN, Judge.**

**{1}** Worker Jesus Gonzalez appeals the decision of the Workers' Compensation Judge (WCJ) denying him modifier benefits from his employer Performance Painting, Inc. (Employer) under NMSA 1978, Section 52-1-26(C) (1990), of the New Mexico Workers'

Compensation Act (the Act), NMSA 1978, §§ 52-1-1 to -70 (1929, as amended through 2007). The WCJ denied modifier benefits because Worker's undocumented immigration status precluded rehire, thereby constituting an unreasonable refusal of Employer's return-to-work offer. The WCJ also denied Worker modifier benefits under Section 52-1-26(D) after he returned to the workforce with a different employer and earned a wage equal to or greater than his pre-injury wage after maximum medical improvement (MMI). Worker contended that Employer should be estopped from asserting a bar to his recovery under Section 52-1-26(C) of modifier benefits because Employer knew or should have known that Worker was undocumented. The WCJ made no explicit ruling on that issue. The WCJ rejected Worker's claim that Employer's return-to-work offer was pretextual and that Worker was denied equal protection of the law. We hold that Worker was not entitled to modifier benefits because Section 52-1-26(C) and (D) are inapplicable to cases involving workers with undocumented, illegal immigration status, and because the Act does not provide for modifier benefits except under the provisions of those statutory subsections.

## BACKGROUND

**{2}**     Worker is an undocumented worker who came from Mexico in 2003. He was hired by Employer in February 2006, after providing a false social security number on his employment application. Teri Jinzo, Employer's office manager, gave persons seeking employment, including Worker, an application to fill out, and she received the application from the applicants when they returned it. Ms. Jinzo never had conversations with anyone, including workers, and including Employer's owner, Joe Spiess, to whom she directly reported, about the need to review documents showing an applicant's legal status to work in the United States. She did not take it upon herself to look into the legal status, nor did she attend any training or seminars, or receive any written materials in that regard. She would simply give the applicant an application, who would take it, fill it out, and return it to her, and she would then give the application to a foreman and from there the foreman "just hired" the applicant.

**{3}**     Ms. Jinzo's practice for new hires was to take the social security numbers they provided in the application and submit them to New Mexico New Hires, an agency about which Employer provides no explanation as to whether it has any duty or conducts any activity or investigation in regard to a worker's undocumented status.[1] New Mexico New

---

[1] Nothing in the record indicates what the function of this agency is, including what, if anything, the agency does with a person's social security number. New Mexico New Hires has a website, http://newhire-reporting.com/NM-Newhire/FAQ.aspx, which explains that employers are required pursuant to state and federal law to report newly hired and re-hired employees to a state directory within twenty days of their hire date. Nothing in this website indicates that the reporting pertains to undocumented workers. It pertains to a child support income withholding order process and the collection of child support.

Hires never informed her that any submitted social security numbers were illegitimate. She never handed out employment eligibility verification forms. As we discuss later in this opinion, employers are required under federal law to complete an employment eligibility verification form, also known as an I-9 form.

**{4}** Worker testified that a friend called "Panda," who worked for Employer, helped him fill out the employment application at Employer's office. According to Worker, Panda wrote in Worker's false social security number that Worker provided, and no one requested Worker to produce a social security card.

**{5}** Mr. Spiess testified that immigration was never discussed. Mr. Spiess stated that "[i]f [the application] looked good, then they would go ahead and hire." Mr. Spiess was not involved in the hiring of Worker. Mr. Spiess stated that he had no reason to believe that Worker was undocumented during the time Worker worked for Employer. Employer's files did not contain a copy of Worker's social security card.

**{6}** In August 2006, Worker was injured while working for Employer, rendering Worker temporarily totally disabled. Worker was placed at MMI on August 30, 2007, was assigned a 3% whole-person impairment based upon his injury, and was released back to work with permanent lifting restrictions, as well as "no climbing of ladders and no extended bending." Worker did not return to work with Employer until January 2008, when Employer offered him employment in a modified capacity. A few weeks later, in late January or early February 2008, Worker stopped working for Employer. The WCJ found that this was due to a combination of Worker's inability to perform the tasks required of him, which often exceeded his medical restrictions, and a slow down in work available. On February 18, 2008, Worker filed a complaint for workers' compensation.

**{7}** Sometime between February and April 2008, Worker found part-time employment that would accommodate his medical restrictions cleaning a baseball stadium and earned approximately $250 per week. Because the work would be over once the baseball season ended around September, Worker began looking for another job in the summer of 2008.

**{8}** During 2007, Employer had a slow down of business and laid off half of its twenty-eight workers. By October 21, 2008, Employer only had four workers left. Employer offered Worker a return to work by letter from its attorneys on two separate occasions, first on April 30, 2008, and a second time on June 16, 2008. Worker testified that after receiving one of the letters, he went by Employer's office and one of Employer's workers communicated to Worker that they had absolutely no work for Worker whatsoever. Then, Worker's attorney asked Worker to go by Employer's office once more to pick up an employment application. On or about June 20, 2008, Worker went to Employer's office to pick up the application, but instead of an application, Worker was given an immigration status verification form. Without knowing what it was, Worker took the form to a person that could assist him in filling out documents in English and that person informed Worker that the document was not an employment application. Worker took the form back to

3

Employer without filling it out and requested an employment application and, at that time, Mr. Spiess asked to see Worker's social security card and driver's license. Worker did not provide any documents and left.

**{9}** Mr. Spiess testified that he did not find out that Worker was undocumented until the date Mr. Spiess was deposed in October 2008. Mr. Spiess further testified that even when Employer's workforce had been reduced to six or seven, or even, perhaps, four employees when it made the offer, Worker was a good employee and "well requested," and Employer would have been able to make room for Worker had Worker been able to provide proper documentation.

**{10}** Worker found employment at the Hi-Lo Market in August 2008, which continued at least through trial on April 16, 2009. Worker was earning a weekly average salary of $359.38 at the time he was injured while working for Employer. The first time that Worker earned in excess of $359.38 after MMI was the week ending on August 16, 2008, when he earned $587.75 at his new employment with Hi-Lo Market.

**{11}** Employer filed a motion for partial summary judgment arguing that because Worker was undocumented and could not accept Employer's return to work offer, Worker's partial permanent disability benefits should be limited to Worker's physical impairment. The WCJ denied the motion, and the case proceeded to a trial on the merits. The WCJ addressed whether Worker's illegal immigration status prevented him from receiving modifier benefits, whether Worker was entitled to permanent partial disability benefits based on return to work, and the rate at which Worker should be paid if Worker were entitled to benefits.

**{12}** The WCJ concluded that Worker was entitled to partial disability benefits commencing August 30, 2007, Worker's MMI date, at the rate of 51% (3% impairment plus 48% modifier points) until June 20, 2008. After June 20, 2008, the WCJ concluded, Worker was entitled to receive benefits at the rate of 3% impairment until conclusion of the benefit period. The WCJ reasoned that Worker was not entitled to modifier points after June 20, 2008, because Worker could not accept a bonafide return-to-work offer by Employer due to Worker's undocumented status, which was equivalent to an unreasonable refusal to a return-to-work offer. The WCJ further found that Worker was also not entitled to modifiers after August 10, 2008, because, although he was employed by a different employer, Worker began earning in excess of his pre-injury wage after this date. Employer did not in the district court and does not on appeal contest Worker's entitlement to permanent partial disability benefits under the Act.

**{13}** Worker appeals arguing that (1) Employer should be estopped from raising the issue of Worker's immigration status because Employer illegally hired Worker; (2) Worker is not barred from receiving modifier benefits because he is working for a different employer earning more than he was when employed by Employer; (3) Employer's offer to return to work was pretextual; and (4) the decision of the WCJ violates Worker's equal protection rights.

4

**DISCUSSION**

**Standard of Review**

**{14}** "We review workers' compensation orders using the whole record standard of review." *Leonard v. Payday Prof'l*, 2007-NMCA-128, ¶ 10, 142 N.M. 605, 168 P.3d 177. "In applying whole record review, this Court reviews both favorable and unfavorable evidence to determine whether there is evidence that a reasonable mind could accept as adequate to support the conclusions reached by the fact finder." *Levario v. Ysidro Villareal Labor Agency*, 120 N.M. 734, 737, 906 P.2d 266, 269 (Ct. App. 1995). "Where the testimony is conflicting, the issue on appeal is not whether there is evidence to support a contrary result, but rather whether the evidence supports the findings of the trier of fact." *Tom Growney Equip. Co. v. Jouett*, 2005-NMSC-015, ¶ 13, 137 N.M. 497, 113 P.3d 320 (internal quotation marks and citation omitted). We review the interpretation of a statute de novo. *Kahrs v. Sanchez*, 1998-NMCA-037, ¶ 11, 125 N.M. 1, 956 P.2d 132.

**The Workers' Compensation Act**

**{15}** The Act defines "worker" in Section 52-1-16(A) as "any person who has entered into the employment of or works under contract of service or apprenticeship with an employer, except a person whose employment is purely casual and not for the purpose of the employer's trade or business." The Act nowhere expressly prohibits or excludes undocumented workers from receiving benefits provided by the Act. A reference to denying benefits to a worker's non-resident alien dependents in Section 52-1-52, as the section existed before it was amended in 1984, was deleted by the 1984 amendment passed by the Legislature. N.M. Laws 1984, ch. 95, § 1; *see Pedrazza v. Sid Fleming Contractor, Inc.*, 94 N.M. 59, 61-62, 607 P.2d 597, 599-600 (1980) (disqualifying the deceased worker's children from receiving workers' compensation benefits by the 1929 version of Section 52-1-52 that stated, "No claim or judgment for compensation, under this act . . ., shall accrue to or be recovered by relatives or dependents not residents of the United States at the time of the injury of such workman" (alteration omitted)). In its place, the Legislature enacted a law that protects all dependents regardless of their residency. Section 52-1-52. In the present case, Employer does not dispute that Worker was entitled to permanent partial disability benefits under the Act based on his physical impairment. Nothing presented by Employer indicates that undocumented workers are precluded from receiving benefits under the Act even if federal law prohibits the workers' employment. In fact, the contrary appears to be the case. *See Boyd v. Permian Servicing Co.*, 113 N.M. 321, 323, 825 P.2d 611, 613 (1992) (indicating that a worker hired in violation of the FLSA was still covered by the Workers' Compensation Act and subject to its provisions).

**{16}** This Court has interpreted Section 52-1-26(C) and (D) to deny modifier benefits to a worker who unreasonably refuses a return-to-work offer. *Connick v. Cnty. of Bernalillo*, 1998-NMCA-060, ¶¶ 9-10, 17, 125 N.M. 119, 957 P.2d 1153 (holding that the worker was entitled only to benefits based on his impairment rating and not to disability benefits based

on the statutory modification of his impairment rating because the worker's incarceration effectively removed him from the labor market and it would have been futile for the employer to offer the worker a job); *Jeffrey v. Hays Plumbing & Heating*, 118 N.M. 60, 63-65, 878 P.2d 1009, 1012-14 (Ct. App. 1994) (holding that the worker's refusal to accept an offer of employment based on his desire to start his own business was not reasonable under Section 52-1-26(D) of the Act, thus affirming the WCJ's decision not to allow application of benefit modifiers under Section 52-1-26(C)).

**The Immigration Reform and Control Act**

**{17}** The Immigration Reform and Control Act of 1986 (IRCA) and *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137 (2002), are central to Worker's claims. *See generally* Immigration and Nationality Act, 8 C.F.R. § 274A (1988, as amended through 2009); 8 U.S.C. § 1101 (1952, as amended through 2009). The objective of the IRCA is to discourage illegal immigration by prohibiting the employment of unauthorized aliens. *See* 8 U.S.C. § 1324(a)(1)(A) (1952, as amended through 2005). "IRCA forcefully made combating the employment of illegal aliens central to the policy of immigration law." *Hoffman Plastic Compounds*, 535 U.S. at 147 (alteration omitted) (internal quotation marks and citation omitted).

**{18}** The IRCA requires employers to verify before hiring "that the person is not an unauthorized alien by examining specified documents that establish the person's identity and eligibility for employment in the United States and completing Form I-9, which evidences that examination." *Coque v. Wildflower Estates Developers, Inc.*, 867 N.Y.S.2d 158, 163 (App. Div. 2008); *see also Reyes v. Van Elk, Ltd.*, 56 Cal. Rptr. 3d 68, 72 n.4 (Ct. App. 2007) ("The IRCA requires employers to verify that each new hire is authorized to work in the United States. The employee must present documents establishing his or her identity and employment authorization.").

**{19}** In the present case, Employer provided no evidence that it used the required I-9 forms, much less used any in connection with Worker's hire. "Form I-9, Employment Eligibility Verification Form, is a document in which an employer hiring an individual for employment in the United States attests under penalty of perjury that he has verified, by examining certain documents, that the employee is not an unauthorized alien." *United States v. Ye*, 588 F.3d 411, 412-13 n.1 (7th Cir. 2009) (internal quotation marks omitted) (citing 8 U.S.C. § 1324(a)(b)(1); 8 C.F.R. § 274a.2). Employers are required to retain the I-9 form for a specified period of time. *Id.* (citing 8 U.S.C. § 1324(a)(b)(3)).

**{20}** Under the IRCA, if the applicant does not have the documents to prove legal status, the applicant cannot be hired. *Hoffman Plastic Compounds*, 535 U.S. at 148. Employers who fail to verify an applicant's eligibility can be subject to civil and criminal penalties. 8 U.S.C. § 1324(a)(1)(B)(i), (e). "Similarly, if an employer unknowingly hires an unauthorized alien, or if the alien becomes unauthorized while employed, the employer is compelled to discharge the worker upon discovery of the worker's undocumented status."

6

*Hoffman Plastic Compounds*, 535 U.S. at 148. "Regrettably, many employers turn a blind eye to immigration status during the hiring process; their aim is to assemble a workforce that is both cheap to employ and that minimizes their risk of being reported for violations of statutory rights. Therefore, employers have a perverse incentive to ignore immigration laws at the time of hiring but insist upon their enforcement when their employees complain." *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1072 (9th Cir. 2004).

**{21}** In regard to the incentive to ignore immigration laws, cases dealing with remedies available to undocumented workers under the Fair Labor Standards Act (FLSA) are illustrative. In *Patel v. Quality Inn South*, 846 F.2d 700, 704 (11th Cir. 1988), the Court held that the IRCA did not purport to limit an undocumented worker's remedies for unpaid wages available under the FLSA since, if these workers were not covered under the FLSA, employers would have an incentive to hire them. Similarly, in *Reyes*, 56 Cal. Rptr. 3d at 78, the California Court of Appeals held that "[b]y reducing the incentive to hire [undocumented] workers[,] the FLSA's coverage of undocumented aliens helps discourage illegal immigration and is thus fully consistent with the objectives of the IRCA." (Internal quotation marks and citation omitted.) *See Singh v. Jutla & C.D. & R's Oil, Inc.*, 214 F. Supp. 2d 1056, 1058 (N.D. Cal. 2002) (reaching the same conclusion).

**{22}** The IRCA does not preempt workers' compensation laws or otherwise preclude states from providing compensation benefits to undocumented workers. *See Dowling v. Slotnik*, 712 A.2d 396, 404 (Conn. 1998); *Econ. Packing Co. v. Ill. Workers' Comp. Comm'n*, 901 N.E.2d 915, 923 (Ill. App. Ct. 2008); *Design Kitchen & Baths v. Lagos,* 882 A.2d 817, 827-28 (Md. 2005); *Correa v. Waymouth Farms, Inc.,* 664 N.W.2d 324, 329 (Minn. 2003); *Rosa v. Partners in Progress, Inc.*, 868 A.2d 994, 1000, 1002 (N.H. 2005); *Coque*, 867 N.Y.S.2d at 162; *Balbuena v. IDR Realty LLC,* 845 N.E.2d 1246, 1257 (N.Y. 2006).

**Worker's Estoppel-Based Argument**

**{23}** In summary judgment proceedings before trial, Worker argued that Employer's unlawful hiring practices should estop Employer from asserting Worker's immigration status to avoid paying modifiers. Worker attempted to support this point through evidence, which the WCJ declined to admit, that Employer either knew or should have known of the illegal immigrant status of Worker because other workers were from Mexico, did not speak any English, and admitted to each other their illegal status. In his requested findings of fact, Worker asserted that "Employer did not follow the law against hiring illegal workers such that Employer and its insurer are estopped from asserting the doctrine of voluntary [underemployment] due to illegal status." In his closing argument at trial, Worker argued that Employer was careless when hiring workers.

**{24}** On appeal, in his brief in chief, Worker cites *Reinforced Earth Co. v. Workers' Compensation Appeal Board*, 810 A.2d 99 (Pa. 2002). Referring to the lower court's opinion in that case, the court in *Reinforced Earth* stated:

> The court reasoned that all that would do is reward an employer who failed to properly ascertain an employee's immigration status at the time of hire, and potentially subvert any public policy against illegal immigration because employers may actively seek out illegal aliens rather than citizens or legal residents because they will not be forced to insure against or absorb the costs of work-related injuries.

*Id.* at 103 (internal quotation marks and citations omitted). The court in *Reinforced Earth* affirmed the lower court, but on different grounds. *Id.* at 104, 109. Based in part on *Reinforced Earth*, Worker states on appeal that it was "[inequitable] for Employer to assert [its] defense of unauthorized alien status due to its negligent hiring practice, estoppel, waiver, unclean hands, [and] laches."

**{25}** In its answer brief, Employer did not address Worker's assertions of estoppel, Worker's contention that Employer's hiring practice was careless, or Worker's indication through his discussion of *Reinforced Earth* that, in ignoring Worker's immigration status, Employer subverted public policy. Employer addressed only Worker's assertion of waiver based on "the fact that Employer hired Worker when Worker was undocumented." Employer contends that "[i]t would be unjust to punish Employer simply because Worker used fake documents that were able to escape Employer's detection through reasonable methods." Employer relies on *Cenvill Development Corp. v. Candelo*, 478 So. 2d 1168, 1169-70 (Fla. Dist. Ct. App. 1985), pointing out that in *Cenvill Development* "an undocumented worker argued that the employer should be estopped from asserting [the] worker's undocumented status as a defense to [the] worker's claims because [the] employer originally hired [the] worker even though he was undocumented." Employer further states that the court in *Cenvill Development* "rejected that argument stating that employers should be estopped from raising a defense based on [a] worker's immigration status only if the employer knew or should have known . . . of [the] worker's undocumented status." In reply, after discussing *Cenvill Development*, Worker states that "Employer should have known this Spanish[-]speaking laborer without a [s]ocial [s]ecurity [card] to copy was likely not documented in the New Mexico labor market."

**An Undocumented Worker Is Not Entitled to Modifier Benefits**

**{26}** In our view, for the reason we discuss later in this opinion, Section 52-1-26, the rationales of *Connick* and *Jeffrey*, the bar of estoppel, and Worker's employment with another employer, are simply not applicable to the circumstance involving whether an injured, undocumented worker is entitled to modifier benefits.

**{27}** Nothing in the Act precludes an injured, undocumented worker from receiving temporary or permanent disability benefits and medical expenses. Modification of a permanent partial disability rating, however, is specifically addressed in Section 52-1-26's provisions. Section 52-1-26(C) states that "[p]ermanent partial disability shall be determined by calculating the worker's impairment as modified by his age, education and physical

8

capacity, pursuant to Sections 52-1-26.1 through 52-1-26.4[.]" But the impairment will not be subject to the modifications calculated pursuant to those sections where the employer offers to rehire and the worker "returns to work at a wage equal to or greater than the worker's pre-injury wage[.]" Section 52-1-26(D). Thus, under the return-to-work circumstance, a worker's permanent partial disability rating can be limited to a rating equal to his impairment only, without the modifiers. *Id.*

**{28}** The Act "provides statutory incentives to both employers and employees to encourage return to work with minimal dependence on compensation rewards." *Lackey v. Darrell Julian Constr.*, 1998-NMCA-121, ¶ 20, 125 N.M. 592, 964 P.2d 153. Section 52-1-26 benefits both employers and workers. An employer is encouraged to make a rehire offer because it relieves the employer of the obligation to pay modifier benefits. An injured worker is encouraged to get off workers' compensation by returning to work with a wage that is at or above his pre-injury wage. As we stated in *Connick*:

> The statutory incentive to return to work is unmistakable. The [L]egislature has explicitly stated that the policy and purpose behind this legislation is to provide every person who suffers a compensable injury with resulting permanent partial disability . . . the opportunity to return to gainful employment as soon as possible with minimal dependence on compensation awards.

*Connick*, 1998-NMCA-060, ¶ 6 (omission in original) (internal quotation marks and citation omitted). A worker does not have to search for other employment. Read as a whole, Section 52-1-26 does not unconditionally grant modifier benefits. When the pre-injury employer offers to rehire at or above pre-injury wage, the worker will lose modifier benefits if he unreasonably refuses to accept the offer. *Connick*, 1998-NMCA-060, ¶¶ 9-10, 17; *Jeffrey*, 118 N.M. at 63-65, 898 P.2d at 1012-14; *see also Reinforced Earth*, 810 A.2d at 108 (holding that where the worker, as an unauthorized alien, could not apply for or accept employment, the worker's loss of earning power was caused by his immigration status and not his work-related injury and therefore the employer was not required to show job availability as a condition precedent to suspending the worker's benefits).

**{29}** Where, as here, an employer is legally forbidden to rehire a worker because the worker is undocumented, we doubt that the Legislature intended Section 52-1-26 to nevertheless apply to allow the worker to receive modifier benefits. Where the pre-injury employer knew or should have known of the injured worker's undocumented status, the employer cannot make a bona fide rehire offer. An offer as contemplated in Section 52-1-26 by a pre-injury employer to rehire an injured, undocumented worker would in that instance be illusory, if not a ruse. Under the IRCA, it would be unlawful for the employer to rehire the worker.

**{30}** Because the parties in their initial briefs on appeal approached the Section 52-1-26 issues with arguments relating to *Connick*, *Jeffrey*, and estoppel, this Court initially analyzed

9

the issues as argued by the parties. In doing so, we determined that we were unable rationally and without tortured analysis to decide the issues within the constraints of those arguments. It became clear to the Court that the arguments and constraints were unworkable under Section 52-1-26 given that an employer is legally forbidden from offering to rehire and, therefore, unless the employer made an illegal, illusory, or bogus offer, an undocumented worker would automatically be entitled to modifier benefits. In the Court's view, the Legislature had not contemplated this circumstance and the Court should leave the issue for legislative consideration.

**{31}**  In addressing these views, Worker argues in supplemental briefing that to hold Section 52-1-26 inapplicable would violate "the application of the policy of equal protection," the fact that there exists "no statutory denial of benefits," and the fact that "federal immigration law [does] not favor[] employers benefitting from violation of law." Worker contends that to hold Section 52-1-26 inapplicable is "perverse" because it encourages employers to rehire injured workers but then allows employers to benefit by paying less to injured workers they illegally employed, and is "morally inequitably wrong" because it "devise[s] a system of compensation where most of the measured disability is denied a worker," and thus fundamental fairness and equal protection of the law are undermined unless Section 52-1-26 is employed and estoppel is applied to prevent an unjust result. To support his denial of equal protection position, Worker cites *Breen v. Carlsbad Municipal Schools*, 2005-NMSC-028, ¶¶ 9-10, 28, 138 N.M. 331, 120 P.3d 413, which held that the Workers' Compensation Act resulted in dissimilar treatment of similarly situated workers, namely, treatment of persons with mental disabilities or physical impairments, and therefore violated the New Mexico's Equal Protection Clause, requiring intermediate scrutiny because persons with mental disability constitute a sensitive class.

**{32}**  We are not persuaded by Worker's fairness and policy arguments, nor are we persuaded by his reliance on *Breen*. We fail to see how our interpretation of the Act and of Section 52-1-26 in particular rises to a constitutional level in any respect. It is clear to us that Worker's undocumented status does not fall into a similarly situated category necessary for an equal protection application. Even were he to fit into such a category, he is not a suspect class and the scrutiny required would be rational scrutiny. *See Plyer v. Doe*, 457 U.S. 202, 219 n.19 (1982) (stating that undocumented workers are a distinct group by virtue of their voluntary act of entering this country illegally, and they are not a suspect class). Worker presents no argument relating to rational scrutiny.

**{33}**  In sum, we cannot ignore the inapplicability of Section 52-1-26 and simply proceed to analyze the issues as framed by the parties in their briefs and determine whether *Connick* and *Jeffrey* preclude Worker from recovery of modifier benefits under Section 52-1-26, whether Employer is estopped from raising *Connick* and *Jeffrey*, and whether Worker would be entitled to modifier benefits even though he earned more than his pre-injury wage when he went to work for another employer. We therefore hold that Worker was not entitled to modifier benefits. The WCJ's denial of modifier benefits was right, albeit for a reason that is different than what we express in this opinion. *See, e.g.*, *Ideal v. Burlington Res. Oil &*

*Gas Co.*, 2010-NMSC-022, ¶ 19, 148 N.M. 228, 233 P.3d 362 (stating that "a district court's decision will be upheld as long as the right result was reached, even if the court reached the decision for the wrong reason").

**CONCLUSION**

**{34}** We affirm the WCJ's denial of Section 52-1-26 modifier benefits.

**{35}   IT IS SO ORDERED.**

_____
                                              **JONATHAN B. SUTIN, Judge**


**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**


_____
**MICHAEL D. BUSTAMANTE, Judge**

**Topic Index for *Gonzalez v. Performance Painting, Inc.*, Docket No. 29,629**

| | |
|---|---|
| **CT** | **CONSTITUTIONAL LAW** |
| CT-EP | Equal Protection |
| | |
| **FL** | **FEDERAL LAW** |
| FL-IM | Immigration |
| FL-PE | Pre-emption |
| | |
| **ST** | **STATUTES** |
| ST-IP | Interpretation |
| ST-LI | Legislative Intent |
| | |
| **WC** | **WORKERS' COMPENSATION** |
| WC-AL | Aliens |
| WC-MO | Modification or Termination of Benefits |
| WC-WG | Workers' Compensation, General |