OPINION BOSSON, Justice. Undocumented workers injured on the job present a special challenge under the W orkers’ Compensation Act. All workers are encouraged to return to work when medically feasible, yet federal law may preclude some employers from extending rehire offers to undocumented workers once they learn of their status. Federal law also requires employers to hire in good faith and demand documentation of prospective employees showing their lawful status. Because an offer to rehire must be a legitimate offer, we hold that employers who cannot demonstrate such good faith compliance with federal law in the hiring process cannot use their workers’ undocumented status as a defense to continued payment of modifier benefits under the Workers’ Compensation Act. The Court of Appeals having decided to the contrary, we reverse. BACKGROUND Jesus Gonzalez (Worker) is an undocumented immigrant, coming to this country from Mexico for the first time in 2003 and again in 2005. In early February of 2006, he was hired by Performance Painting, Inc. (Employer) as a painter’s helper. By all accounts, Worker was a good employee and worked without incident until August 31, 2006. On that date, Worker fell off a ladder, injuring his shoulder. As a result of the injury, Worker was temporarily totally disabled and unable to work. The injury required multiple surgeries and months of physical therapy. Worker reached maximum medical improvement on August 30, 2007. He was assigned a 3 percent permanent base impairment rating based upon his shoulder injury and its effect upon his whole body. He was also permanently restricted in the type of work he could perform, including no lifting above his head, all lifting limited to ten pounds occasionally or up to five pounds frequently, and no climbing ladders or extended bending. W orker temporarily returned to work with Employer in January of 2008. By early February, however, Worker stopped going to work, due at least in part to Employer’s inability to accommodate his injury-related work restrictions. Worker also claims that he stopped working because of a slowdown in the amount of work available. Worker then filed a complaint for workers’ compensation on February 18, 2008. Sometime in late April, W orker received a letter through his attorney offering Worker a chance to return to work for Employer. The letter was written by and on the letterhead of legal counsel for Employer’s Insurer. The employment offer was for modified duty, taking into account Worker’s injury-related restrictions. As will be discussed later in more detail, an injured worker with a permanent partial disability is entitled to additional modifier benefits based upon the worker’s age, education, and physical capacity but only until the worker returns to work at the same or better wage. NMSA 1978, § 52-1-26(C) & (D) (1990). Hence, Employer’s offer among other things was an attempt to limit its continuing obligation to pay modifierbenefits. The offer required Worker to fill out a new application which would explicitly “include verification of his eligibility for employment.” Worker received at least three such letters. On June 20, 2008, Worker appeared in Employer’s office to fill out the necessary paperwork to return to work. Worker began filling out the application packet and was asked to produce a social security card, which Employer had not requested previously. Unable to complete the verification, Worker left the office and never returned. In early August of 2008, Worker began working elsewhere and continued to work there through trial. For the week ending on August 16, 2008, for the first time since his injury, Worker made a wage in excess of his pre-injury wage. During the proceedings before the Workers’ Compensation Administration, Employer argued that Worker’s failure to prove eligibility to work on June 20, 2008, constituted an unreasonable refusal to return to work, thereby limiting Worker’s benefits to the base impairment rating without any modifier benefits. The Workers’ Compensation Judge (WCJ) agreed. The WCJ concluded that Worker was entitled to partial disability benefits commencing August 30,2007, Worker’s date of maximum medical improvement, at the rate of 51 percent, (3 percent permanent physical impairment plus 48 percent modifier points), but only until June 20, 2008. After that date, Worker was only entitled to his 3 percent permanent impairment rating because “Worlcer could not accept a bona fide return to work offer made by Employer” due to his immigration status, and therefore “Worker unreasonably refused a return-to-work offer from Employer.” Worker appealed and the Court of Appeals affirmed but for slightly different reasons which we will discuss in turn. See Gonzalez v. Performance Painting, Inc., 2011-NMCA-025, ¶ 1, 150 N.M. 306, 258 P.3d 1098. We granted certiorari to review an important point of law that potentially affects numerous undocumented workers across this state. DISCUSSION Workers’ Compensation Act The purpose of the Workers’ Compensation Act (WCA) is to provide “quick and efficient delivery of indemnity and medical benefits to injured and disabled workers at a reasonable cost to the employers who are subject to [its] provisions.” NMSA 1978, § 52-5-1 (1990). The WCA is a delicate balance between the rights and interests of the worker and the employer. See id. Thus, “any judicial analysis under the [WCA] must balance equally the interests of the worker and the employer without showing bias or favoritism toward either.” Salazar v. Torres, 2007-NMSC-019, ¶ 10, 141 N.M. 559, 158 P.3d 449. Both parties agree that the WCA generally applies to undocumented workers, at least since legislative action taken to that effect in 1984. See Performance Painting, 2011-NMCA-025, ¶ 15 (noting the Legislature’s 1984 deletion from the WCA of the denial of benefits for a worker’s nonresident alien dependents). Accordingly, the benefits awarded prior to Worker reaching maximum medical improvement are not at issue. Neither does Employer dispute Worker’s entitlement, despite his undocumented status, to the 3 percent permanent partial disability benefits based on his physical impairment rating. The dispute in this case focuses instead on whether Worker’s status as an undocumented immigrantprevents him from receiving permanent partial disability modifier benefits which were calculated at 48 percent of his pre-injury wage. We proceed to that question, and begin with the WCA itself. Permanent Partial Disability As previously stated, once an injured worker reaches maximum medical improvement, the worker may be eligible for permanent partial disability benefits if the worker has suffered a “permanent impairment.” NMSA 1978, § 52-l-26(B) (1990). The amount of benefits are “determined by calculating the worker’s impairment as modified by his age, education and physical capacity.” Section 52-1-26(C). The age and education modifiers are added together and then multiplied by the physical capacity modifier. NMSA 1978, § 52-1-26.1(B) (1990). This number is then added to the base impairment rating to determine the total award. NMSA 1978, § 52-1-26.1 (C) (1990). This case illustrates the significance of both benefits, where Worker’s base impairment was only 3 percent, but his modifier benefits added another 48 percent. As noted earlier, modifier benefits are not permanent. Section 52-1-26(D) states that “[i]f, on or after the date of maximum medical improvement, an injured worker returns to work at a wage equal to or greater than the worker’s pre-injury wage, the worker’s permanent partial disability rating shall be equal to his impairment and shall not be subject to modifications.” In other words, the WCA provides the employer with an incentive to re-employ the injured worker, and the worker has an incentive to accept a reasonable return-to-work offer, both of which relieve the worker’s compensation system. It could be argued that the plain meaning of the statute is clear, in that an injured worker is entitled to modifier benefits until the worker actually “returns to work,” which would allow the worker to decide whether to work at all. Under this theory, an injured worker could refuse even a reasonable and legitimate return-to-work offer and continue collecting modifier benefits, even if the worker simply did not feel like working. But, this Court has cautioned in the past against reading the WC A too literally. As this Court stated in Chavez v. Mountain States Constructors, “New Mexico appellate courts have previously recognized that the provisions of the [WCA] are imprecise. . . . This serves as a warning that the plain language rule may not be the best approach to interpreting this statute.” 1996-NMSC-070, ¶ 25, 122 N.M. 579, 929 P.2d 971. Therefore, a literal interpretation of the WCA is not always appropriate. Such an interpretation would upset the delicate balance between workers and employer interests present in the WCA. It would give sole control over how long a worker collects modifier benefits to the worker. As this case demonstrates, with Worker’s base impairment rating of 3 percent and modifier benefits of 48 percent, modifier benefits can be a significant portion of the total amount of permanent partial disability benefits. Allowing a worker to refuse a reasonable and legitimate return-to-work offer in favor of continuing to collect modifier benefits, is simply not the scheme the Legislature intended. Finally, this interpretation would ignore the following stated purpose of permanent partial disability benefits: As a guide to the interpretation and application of this section, the policy and intent of this legislature is declared to be that every person who suffers a compensable injury with resulting permanent partial disability should be provided with the opportunity to return to gainful employment as soon as possible with minimal dependence on compensation awards. Section 52-1-26(A) (emphasis added). The stated purpose is to provide an opportunity to return to work. A reasonable and legitimate return to work offer would fulfill this purpose, even if the offer is refused. But, if a worker were allowed to refuse a reasonable job offer and continue collecting modifier benefits, the worker would be more dependent on the compensation award. Thus, a scheme in which a worker could refuse an employment opportunity in favor of receiving more benefits would directly contradict the Legislature’s stated purpose. Accordingly, our Court of Appeals has correctly interpreted this section of the WCA to mean that if an injured worker refuses a reasonable return-to-work offer, the worker becomes ineligible for modifier benefits. In Jeffrey v. Hays Plumbing & Heating, the injured worker refused an employer’s return-to-work offer in favor of starting his own business. 118 N.M. 60, 61, 878 P.2d 1009, 1010 (Ct. App. 1994). The Court of Appeals held that rewarding voluntary unemployment or underemployment — by allowing a worker to refuse a reasonable return-to-work offer but continue collecting modifier benefits — “would be contrary to the [WCA].” Id. at 64, 878 P.2d at 1013. The Court stated that such benefits should be “denied if a claimant, through voluntary conduct unconnected with his injury, takes himself out of the labor market.”[1] Id. (internal quotation marks and citation omitted). The holding in Jeffrey was later applied in Connick v. County of Bernalillo, 1998-NMCA-060, 125 N.M. 119, 957 P.2d 1153, again to deny modifier benefits. In Connick, the injured worker was later sent to prison for second-degree murder, but still claimed he was entitled to continuing modifier benefits. Id. ¶¶ 2-3. The Connick Court affirmed that “after Jeffrey, disability benefits (other than impairment) may be denied, reduced, or suspended if a claimant voluntarily . . . takes himself out of the job market.” Id. ¶ 8. The Court reasoned that “[ajlthough there is no evidence that a job offer was made in this case, it would have been futile to do so under the circumstances; Claimant’s incarceration effectively removed him from the labor market.” M ¶ 9. In this case, the WCJ denied Worker modifier benefits, presumably relying on Jeffrey and Connick. Specifically, the WCJ concluded that “Worker could not accept a bona fide return-to-work offer made by Employer due to Worker’s status as an illegal undocumented worker.” As a result, “Worker unreasonably refused a return-to-work offer from Employer.” The Court of Appeals also denied Worker modifier benefits, although for different reasons. Performance Painting, 2011-NMCA-025, ¶ 1. The Court of Appeals held that undocumented workers are categorically ineligible for modifier benefits — in every case — because under federal law they are ineligible to work. Id. ¶ 33. The Court reasoned that “[w]here, as here, an employer is legally forbidden to rehire a worker because the worker is undocumented, we doubt that the Legislature intended Section 52-1-26 to nevertheless apply to allow the worker to receive modifier benefits.” Id. ¶ 29. To a limited degree, the Court of Appeals’ conclusion has certain merit based on the effect of federal law, at least in some instances, on an employer’s efforts to rehire an undocumented worker. But that is not the end of our analysis, nor do we believe it captures all of what our Legislature reasonably intended in a situation like this. Simply put, the Court of Appeals’ conclusion in this case turns a blind eye to the reality of undocumented workers all across this state and to the facts of this case in particular. The reasoning, stated simply, is that because Worker is not allowed to work, then he cannot work, and that if he cannot work, then he does not work, either for Employer or someone else. Because he cannot work, modifier benefits — based in part on his ability to return to work — cannot apply. Yet Worker does work. He has held numerous jobs since entering the United States, including his employment by Performance Painting. At the time of trial, Worker had already found a new job and was working full time for a different employer at a better wage. Modifier benefits would have terminated at that point even without a return-to-work offer by Employer. Whether lawful or not, men and women like Worker in this case often do find employment somewhere, and when they do, modifier benefits can be terminated in the manner prescribed by the WCA. In addition, refusing modifier benefits to undocumented workers across the board would give rise to other problems. It would create a perverse incentive for employers to hire undocumented workers over other workers, especially in high-risk jobs that often result in workers’ compensation claims. An employer could hire undocumented workers, knowing that in the event of injury the employer would likely pay a much lower amount in workers’ compensation benefits due to ineligibility for modifier benefits. This would again upset the balance the Legislature created in the WCA — this time tipping it in favor of the employer as opposed to the worker. Other courts have noted this problem. See Rivera v. NIBCO, Inc., 364 F.3d 1057, 1072 (9th Cir. 2004). (“[Ejmployers have a perverse incentive to ignore immigration laws at the time of hiring but insist upon their enforcement when their employees complain.”). There is a better approach, one more consistent with legislative intent. The essence of the Court of Appeals’ holding seems based more on the potential unfairness to a particular employer, one who normally would offer reemployment in order to save money on modifier benefits (or avoid higher insurance premiums), but who cannot legally do so once the employer learns of the illegal status of its former worker. We agree that fairness should prevail on behalf of such an employer, so long as the employer can show he did the best he could under the circumstances to avoid the predicament. In other situations, however, where the employer is culpable for improperly hiring the worker in the first place, the worker should not shoulder all the responsibility. That would upset the delicate balance between worker and employer interests that our Legislature has required. See Section 52-5-1 (stating that the WCA is not to be construed “in favor of the claimant or employee on the one hand, nor are the rights and interests of the employer to be favored over those of the employee on the other hand.”); Salazar, 2007-NMSC-019, ¶ 10; Delgado v. Phelps Dodge Chino, Inc., 2001-NMSC-034, ¶ 12, 131 NM 272, 34 P.3d 1148. The Courtof Appeals correctly noted that [w]here the pre-injury employer knew or should have known of the injured worker’s undocumented status, the employer cannot make a bona fide rehire offer. An offer as contemplated in Section 52-1-26 by a pre-injury employer to rehire an injured, undocumented worker would in that instance be illusory, if not a ruse. Performance Painting, 2011-NMCA-025, ¶ 29. We agree with this statement of the law. Whether an employer knew or should have known, before the worker was injured, that a worker was undocumented determines whether an employer’s rehire offer was legitimate and should be the focus of our inquiry and the basis of determining whether the injured worker is entitled to modifier benefits. Such a focus maintains the appropriate neutrality between employers and workers and in doing so stays true to the original intent of the Legislature. The Immigration Reform and Control Act As noted in the Court of Appeals opinion, see id. ¶ 17, Congress passed the Immigration Reform and Control Act (IRCA) in 1986. Pub. L. No. 99-603, 100 Stat. 3359 (1986) (codified as amended in scattered sections of 8 U.S.C.). IRCA seeks to discourage illegal immigration by making it unlawful to hire undocumented workers. See 8 U.S.C. § 1324a(a)(1)(A) (2006). As stated by the United States Supreme Court, “IRCA forcefully made combating the employment of illegal aliens central to [t]he policy of immigration law.” Hoffman Plastic Compounds, Inc. v. N.L.R.B., 535 U.S. 137, 147 (2002) (internal quotation marks and citation omitted). Thus, under IRCA, employers “have an affirmative duty to determine that their employees are authorized.” New El Rey Sausage Co., Inc. v. U.S. I.N.S., 925 F.2d 1153, 1158 (9th Cir. 1991). As the Court of Appeals noted, this is accomplished by imposing a legal duty on employers that includes “examining specified documents that establish the person’s identity and eligibility for employment in the United States and completing Form 1-9, which evidences that examination.” Performance Painting, 2011-NMCA-025, ¶ 18 (quoting Coque v. Wildflower Estates Developers, Inc., 58 A.D.3d 44, 49 (2008)). If the employer fails to properly inspect the documents, then the employer “has failed to adequately ensure that the alien is authorized.” New El Rey Sausage Co., 925 F.2d at 1158. Accordingly, penalties can be assessed for the failure to follow the proper procedure in filling out an 1-9 Form. 8 U.S.C. § 1324a (e)(5) (as amended through 2005). While a completed 1-9 Form need not actually be submitted for verification in New Mexico, all employers are required to keep the completed forms for a minimum of three years. 8 U.S.C. § 1324a(b)(3)(B)(i) & (ii). Based on these federal requirements, an employer who does not properly fill out an 1-9 Form and demand necessary documentation, as is required, either should have known or is deemed to have known that the worker would likely be undocumented and ineligible for rehire in the event of injury. The 1-9 Form is how an employer gains knowledge of a newly hired worker’s eligibility for employment. If an employer fails to fill out the form and demand proof of documentation, either purposefully or negligently, then the employer has failed to perform his affirmative duty to determine the worker’s eligibility for employment. Based on this failure, knowledge of the worker’s immigration status can be imputed to the employer for the purposes of Workers’ Compensation benefits. An offer to rehire would then be, in the words of the Court of Appeals, “illusory, if not a ruse.” And under these circumstances the employer should fairly bear the responsibility for that predicament, one of his own creation. The employer would fairly owe modifier benefits. On the other hand, there are other times when an employer has properly filled out the 1-9 form, but an undocumented worker presents false documents. In this situation, IRCA provides for an affirmative defense to a violation, if the employer has complied in good faith with IRCA’s requirements. 8 U.S.C. § 1324a(a)(3). We see no reason why such a defense should not apply to cases involving modifier benefits. Accordingly, if a worker presents false documents to an employer during the initial hiring and the employer does not otherwise know or should know of the worker’s undocumented status, then the worker should not be allowed to benefit from such deception by collecting modifier benefits. In any case, an employer can protect itself simply by following the law. In our view, this resolution strikes an appropriate balance between employers and workers, as the Legislature intended in the WCA, regarding undocumented workers and modifierbenefits. If an otherwise nonculpable employer has complied with the federal requirements of IRCA, and properly fills out an 1-9 form including necessary documentation, the employer cannotbe forced to pay modifier benefits to an undocumented worker. This is true even if the employer has, post-injury, learned of the worker’s undocumented status. An otherwise nonculpable employer can establish a good faith defense. This approach favors neither the worker or the employer. Whichever party is more culpable, by either failing to perform an affirmative duty or presenting false documents to obtain employment, suffers the most; he is not permitted to benefit from that party’s own wrongdoing. Employer Did Not Properly Confirm Worker’s Eligibility to Work We now turn to the facts of this case to evaluate Employer’s return-to-worlc offer. Despite both Worker and Employer requesting findings of fact on whether Employer should have known that Worker was undocumented, the WCJ failed to rule on this issue. In his defense, the WCJ admitted that the law regarding undocumented workers and modifier benefits was unclear, and he hoped to get an appellate court ruling on the matter. The Court of Appeals stated that “[i]n the present case, Employer provided no evidence that it used the required 1-9 forms, much less used any in connection with Worker’s hire.” Performance Painting, 2011-NMCA-025, ¶ 19. Following our review of the whole record, see Rodriguez v. Permian Drilling Corp., 2011-NMSC-032, ¶ 7, 150 N.M. 164, 258 P.3d 443, we agree. The evidence demonstrates convincingly that Employer did not follow the proper procedures when Worker was initially hired. Employer testified at trial about the hiring process at Performance Painting. Specifically, Employer testified that the office manager would have been responsible for Worker’s paperwork when he was initially hired. In her deposition, the office manager testified that she did not personally hand out any 1-9 forms. She also testified that she never received any training regarding how to document immigration status and never inquired about the immigration status of newly hired workers. There was much discussion and testimony before the WCJ about how Worker provided a false social security number, but never any indication that he actually presented a social security card. In fact, when asked why Worker’s employment file contained no copy of such identification, according to Employer’s usual practice, Employer stated by assumption that the office manager “was using the New Hires form . . . and using the state to verify.” The record contains two different 1-9 forms for Worker, neither of which are properly completed. The first is dated June 20, 2008, and appears to be the 1-9 form that Worker began but never completed when attempting to accept Employer’s return-to-work offer. The other 1-9 form is not dated, making it impossible to determine when it was filled out. Each form, however, is only partially completed, with the section Employer is supposed to complete after the inspection of the appropriate documents left blank on each. There is no other evidence or testimony in the record regarding whether an 1-9 Form for Worker was properly completed near the time of his initial hiring. Thus, it is clear to us that Employer failed to follow appropriate hiring procedures, as required by federal law, and failed to properly fill out an 1-9 form and keep it on file for the requisite time period. Accordingly, we hold that Employer should have known that Worker was undocumented, and any return-to-work offer made by Employer was illusory. Therefore, Worker is entitled to modifier benefits. Employer argued at length before the WCJ that because he sent the appropriate documentation to New Mexico New Hires and never received word of any problems, he could not have known that Worker was undocumented. The Court of Appeals indicated that “[njothing in the record indicates what the function of this agency is, including what, if anything, the agency does with a person’s social security number.” Performance Painting, 2011-NMCA-025, ¶ 3 n. 1. A cursory examination of the New Mexico New Hire’s website and the law that created it instantly reveals the fallacy of Employer’s argument. NMSA 1978, Sections 50-13-1 to -4 (1997), established the New Mexico New Hires database which requires employers to submit certain information about each worker they hire. According to the statute, “[t]he state directory ofnew hires shall use the information received to locate individuals for purposes of establishing paternity and establishing, modifying and enforcing child support obligations.” Section 50-13-3 (B). The database’s website also espouses a similar purpose. New Mexico New Hires Directory, a v a Hable at http://newhire-reporting.eom/NM-newhire/F AQ.aspx#wdwn. Neither the statute nor the website ever suggest that the database performs employment eligibility verification, and the database should not be relied upon as such. The reason that Employer never received any word from New Mexico New Hires that there were any problems with his newly hired workers is because they did not owe child support or have any paternity issues, not because they were all eligible to work in the United States. Worker’s Entitlement to Modifier Benefits Ceased Upon Returning to Work at His Pre-Injury Wage Worker also argues that he continues to be eligible for modifier benefits even though he has returned to work at a wage equal to or greater than his pre-injury wage, because he has not returned to work for his pre-injury employer. By analogy, Worker relies on Grubelnik v. Four-Four, Inc., 2001-NMCA-056, 130 N.M. 633, 29 P.3d 533, a case involving a return-to-work provision for temporary total disability as opposed to permanent partial disability, for this proposition. In Grubelnik, the Court of Appeals determined that a worker remained entitled to full temporary total disability after returning to work with a different employer. 2001-NMCA-056,1 1. NMSA 1978, Section 52-1-25.1(B) (1990) (amended 2005) states that “[i]f, prior to the date of maximum medical improvement, an injured worker’s health care provider releases the worker to return to work and the employer offers work at the worker’s pre-injury wage, worker is not entitled to temporary total disability benefits.” The worker in Grubelnik did obtain a release to return to work but began working for a different employer, as he knew that his preinjury employer could not accommodate his restrictions. Grubelnik, 2001-NMCA-056, ¶¶ 4-5. The Court of Appeals held that the term “employer” in the return-to-work provision of Section 52-1-25.1(B) specifically referred to the pre-injury employer. Grubelnik, 2001-NMCA-056, ¶ 21. As a result, the worker could continue collecting full TTD benefits. Id. ¶ 26. This holding, however, was superceded by the Legislature in 2005, a fact not mentioned in the briefing by either side. The current version of the statute reads as follows: B. If, prior to the date of maximum medical improvement, an injured worker’s health care provider releases the worker to return to work, the worker is not entitled to temporary total disability if: (1) the employer offers work at the worker’s preinjury wage; or (2) the worker accepts employment with another employer at the worker’s preinjury wage. Section 52-1-25.1(B) (2005) (emphasis added). While there is no specific mention of Grubelnik in the amended statute, the expression of legislative policy on this issue is clear. A return-to-worlcprovision is no longer contingent on returning to work for the preinjury employer. Although the case before us involves permanent partial disability as opposed to temporary total disability in Grubelnik, we see no reason, and Worker has not offered one, that the legislative policy was only intended to be applied to temporary total disability. Thus, Worker is not entitled to modifier benefits from the time he began earning an amount equal to or greater than his pre-injury wage with a new employer. According to the WCJ, this occurred beginning with the week ending August 16, 2008, and that finding was not challenged on appeal, see Johnston v. Sunwest Bank of Grant Cnty., 116 N.M. 422, 423-24, 863 P.2d 1043, 1044-45 (1993) (“Unchallenged findings of the trial court are binding on appeal.”). Therefore, Worker is ineligible for modifier benefits from that date on. To be clear, Grubelnik is hereby overruled. CONCLUSION For these reasons, we hereby reverse the Court of Appeals. IT IS SO ORDERED. RICHARD C. BOSSON, Justice WE CONCUR: PETRA JIMENEZ MAES, Chief Justice BARBARA J. VIGIL, Justice EDWARD L. CHÁVEZ, Justice (specially concurring). CHARLES W. DANIELS, Justice (specially concurring). If Worker had been denied all benefits, we would readily agree with the sentiments expressed in the Special Concurrences that undocumented workers are entitled to impairment benefits. The law is clear, as in this case, that impairment benefits — based on physical injury — cannot be denied, and were not denied in this case, due to undocumented status. But since 1991, the Legislature has separated permanent partial disability benefits into two categories, impairment and modifier, and this opinion only concerns the latter. Modifier benefits are based in part on “the difference between the physical capacity necessary to perform the worker’s usual and customary work and the worker’s residual capacity.” Section 52-1-26.4(B). The effect of physical impairment upon ability to work remains, therefore, part of the calculus that the Legislature — not the judiciary — has created to assess overall benefits. See Section 52-1-26(A) (declaring legislative policy that injured workers be provided with the opportunity to return to work). It is this continuing reference in the Act itself to physical capacity to work that gave rise to Jeffrey and directs the result we reach in this case. As suggested in the Special Concurrences, we would all welcome additional clarity from our legislative branch. Until that time, however, we have no choice but to make principled distinctions that reconcile statutory language and purpose.