IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOSE CAMPOS, | § | |
| | § | |
| | § | |
| Appellant-Below, | § | No. 33, 2014 |
| Appellant, | § | |
| | § | |
| v. | § | Court Below: |
| | § | Superior Court of the State of |
| DAISY CONSTRUCTION | § | Delaware in and for New Castle |
| COMPANY, | § | County |
| | § | |
| Appellee-Below, | § | C.A. No. N13A-07-002 ALR |
| Appellee. | § | |

Submitted:  September 24, 2014
Decided:  November 13, 2014

Before **STRINE**, Chief Justice; **HOLLAND** and **VALIHURA**, Justices;
**BOUCHARD**, Chancellor; **CROWELL**, Judge,[*] constituting the Court *en Banc*.

Upon appeal from the Superior Court.  **REVERSED**.

Timothy E. Lengkeek, Esquire (*argued*), Erika R. Caesar, Esquire, Young
Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, for Appellant.

John Morgan, Esquire (*argued*), Anthony N. Delcollo, Esquire, Heckler &
Frabizzio, Wilmington, Delaware, for Appellee.

**STRINE**, Chief Justice:

---

[*] Sitting by designation under Del. Const. art. IV, § 12.

# I. INTRODUCTION

Jose Campos was injured while working for Daisy Construction Company ("Daisy"). While Campos was receiving total disability payments from Daisy, Daisy performed an investigation of his social security number at the request of its workers' compensation insurance carrier and discovered that Campos was an undocumented worker. When Campos could not provide a valid number, Daisy terminated his employment. Around the same time, Daisy hired a doctor to re-evaluate Campos' medical condition. The doctor concluded that although Campos remained partially disabled, he could perform "light duty" work with restrictions. Daisy then filed a petition with the Industrial Accident Board (the "Board") to terminate Campos' total disability benefit payments. The Board granted Daisy's petition because Campos was physically capable of working and therefore was not totally disabled. The Board also found that Campos was not eligible for partial disability benefits, reasoning that Daisy had met its burden of showing that Campos had no decrease in earning capacity by testifying that Campos would be eligible for light duty jobs at Daisy at his pre-injury wage rate if he could provide a valid social security number. The Superior Court affirmed the Board's decision.

We conclude that the Board erred when it found that Campos was not eligible for partial disability benefits. To avoid making these payments, Daisy was required to prove that Campos did not have reduced earning power, which required a showing of job availability. Daisy's statement that it would re-hire Campos if not for his immigration issues was insufficient to demonstrate job availability because the job was not in fact

1

available to Campos to take. If we were to hold that Daisy's testimony constituted sufficient proof of job availability, an employer could always hire an undocumented worker, have him suffer a workplace injury, and then avoid partial disability benefit payments by "discovering" his immigration status, offering to re-employ him if he could fix it, and claiming that a job is available to him at no loss in wages. This outcome would be contrary to the Workers' Compensation Act and our case law interpreting it, including *Delaware Valley Field Services v. Ramirez*, which prevents employers from depriving undocumented workers of employment benefits.[1] It would also disserve federal immigration law by encouraging employers to hire undocumented workers in order to reduce their expenses for workplace safety and employee pay and benefits. Finally, this result would cause workplace safety for all Delaware workers to suffer, because employers would not bear the full costs of workplace accidents and therefore would have less incentive to invest in safety measures.

Accordingly, Daisy must continue to pay partial disability payments until it can demonstrate that Campos has no decrease in earning power from his workplace injury, or until the statutory period for partial disability benefit eligibility expires. Federal restrictions that prevent employers from hiring undocumented workers may make it more difficult for Daisy to prove job availability, but any difficulty is appropriately borne by it as the employer, who must take the employee, Campos, as it hired him.

---

[1] 2012 WL 8261599 (Del. Super. Jan. 16, 2014), *aff'd*, 61 A.3d 617 (Del. 2013).

## II.  BACKGROUND[2]

In September 2008, Daisy hired Campos, who speaks almost no English, without verifying his social security number.  The record supports an inference that this may have been a common practice at Daisy and that some of Daisy's 150 employees are still undocumented workers.  Daisy points out that it now uses the Department of Homeland Security's E-Verify system to check the social security number provided by each new employee, in compliance with the Immigration Reform and Control Act of 1986 ("IRCA").[3]  But when Daisy hired Campos, it was not using the E-Verify system, even though Congress had previously authorized the program for use in all 50 states.[4]

Campos worked for Daisy for three years before he was thrown off the back of a truck while working on a traffic crew, resulting in permanent impairment of his shoulder and back.  He returned to work after a four-day hiatus but continued to experience considerable pain from his injuries.  Campos eventually underwent shoulder surgery, after which he did not return to work.  At that point, Daisy placed Campos on total disability at a compensation rate of $474.30 per week.

Around this same time, Daisy investigated Campos' social security number at the request of its worker's compensation insurance carrier.  This investigation was limited to

---

[2] These factual details are taken from the appendices submitted by the parties in this appeal.

[3] The IRCA created an employment verification system, in which employers must examine potential employees' social security cards, driver's licenses, or other documentation or evidence that they are authorized to work in the United States, and attest to the potential employees' eligibility before they can start work.  8 U.S.C. § 1324a(b) (2002).

[4] *See* National Conference of State Legislatures, E-Verify FAQ, *available at* http://www.ncsl.org/documents/immig/E-VerifyFAQ2.pdf.

Campos only. That is, Daisy did not check (and their counsel candidly admitted at argument, has not checked) the social security numbers previously provided by any of its other 150 employees. The investigation of Campos revealed that the social security number he had given Daisy was not valid.[5] When Campos was not able to provide a valid social security number, Daisy discharged him. Shortly thereafter, Daisy hired a doctor to re-evaluate Campos' condition, and the doctor concluded that although Campos was still impaired, he was physically capable of returning to light duty work with restrictions.[6] Daisy then filed a petition with the Board seeking the termination of Campos' total disability benefits because Campos was physically capable of returning to work.

The Board granted Daisy's petition, reasoning that Campos was no longer totally disabled because he was physically capable of working and therefore was not displaced from the workforce. The Board also determined that Campos was not eligible for partial disability benefits. The Board found that Daisy had met its burden to show that Campos had no decrease in earning capacity because Daisy's risk manager testified that light duty jobs were available at Daisy at the same wage rate that Campos had earned previously and that Campos would be eligible for these jobs if he could provide a social security number. Because Campos could have returned to work at the same wage rate but for his

_____

[5] It appears that Daisy had been paying various taxes on behalf of Campos, such as social security taxes, without any report from the relevant government agencies that Campos was not a proper beneficiary.

[6] The doctor reported that Campos was not able to return to construction work, but that he would be able to return to light duty work "with the ability to change positions periodically, avoiding repeating bending and no lifting over 10 pounds." App. to Opening Br. at 121.

status as an undocumented worker, and because immigration status is not taken into account when determining a person's entitlement to benefits, the Board found that Campos was not entitled to partial disability benefits. The Board did find that Campos was eligible for permanent impairment compensation for the loss of the use of his shoulder under 10 *Del. C.* § 2320(10)(b) and awarded him a lump sum payment from Daisy of $18,972.

Campos appealed to the Superior Court, contending that he was improperly denied eligibility to receive partial disability benefits because Daisy had not met its burden to show that a job was in fact available to him, and thus, had not demonstrated that he had no loss in earning power. On January 16, 2014, the Superior Court affirmed the Board's decision, holding that Campos did not qualify for partial disability because his inability to work stemmed from his lack of a valid social security number and not from a work-related injury.[7]

This appeal followed.

---

[7] *Campos v. Daisy Constr. Co.*, 2014 WL 642067, at *2 (Del. Super. Jan. 16, 2014). The Superior Court also relied on the "displaced worker" doctrine in affirming the Board's decision to terminate Campos' benefits. This Court has defined a displaced worker as "one who, while not completely incapacitated, is so handicapped by the compensable injury that he or she will no longer be employed regularly in any well-known branch of the labor market and will require a specially created job to be steadily employed." *Keeler v. Metal Masters Foodservice Equipment Co.*, 712 A.2d 1004, 1005 (Del. 1998). A displaced worker is deemed "totally disabled" and entitled to total disability benefits. *See id.* But the displaced worker doctrine was not relevant to Campos' appeal, which challenged the Board's finding that he was ineligible for *partial* disability benefits. Campos does not claim that he is displaced from the labor market and he is not required to prove that he is totally disabled in order to claim partial disability benefits.

## III. ANALYSIS

On appeal, the Supreme Court reviews decisions of the Industrial Accident Board to determine if the decision is free from legal error, and whether the agency's decision was "supported by substantial evidence on the record before the agency."[8] Errors of law are reviewed *de novo.*[9]

Daisy argues that the Superior Court was correct to conclude that Campos was ineligible for partial disability benefits because Daisy was willing to employ him at his pre-injury wage if he could get a valid social security card and thus had demonstrated that work was available within Campos' restrictions at the same wage rate. Campos, on the other hand, argues that he is now being denied partial disability benefits due to his immigration status, contrary to the Superior Court's holding in *Delaware Valley Field Services v. Ramirez*, which this Court affirmed.[10] In particular, Campos argues that the Board erred by determining that a job was available to him at Daisy when Daisy was in fact unwilling to allow him to fill it.

When an employer petitions to terminate or modify total disability benefits, as Daisy did in this case, the employer must prove that there has been a change in the employee's condition.[11] The employer must also prove that the claimant is not partially

---

[8] 29 *Del. C.* §§ 10142, 10161(a)(8); *Abrahams v. Chrysler Grp., LLC*, 44 A.3d 921 (Del. 2012) (Table).

[9] *Vincent v. E. Shore Mkts.*, 970 A.2d 160, 163 (Del. 2009).

[10] 2012 WL 8261599 (Del. Super. Jan. 16, 2014) (holding that illegal status cannot disqualify a person from receiving benefits), *aff'd*, at 61 A.3d 617 (Del. 2013).

[11] *Mladenovich v. Chrysler Grp., LLC*, 2011 WL 379196, at *3 (Del. Super. Jan. 31, 2011).

6

disabled when the evidence demonstrates "that in spite of improvement, there is a continued disability" that "could reasonably affect the employee's earning capacity."[12]

On appeal, Campos does not challenge the Board's decision to terminate his total disability benefits, and instead solely contests the denial of his partial disability benefits. Thus, the specific issue before us is whether the Board's decision that Campos was ineligible for partial disability benefits is consistent with the Workers' Compensation Act and supported by substantial evidence on the record.

Under Delaware law, an employee who is partially disabled due to a work-related accident is entitled to compensation.[13] The Workers' Compensation Act does not define "partial disability." Instead, 19 *Del. C.* § 2325, the statutory provision authorizing partial disability compensation, provides in relevant part:

> For injuries resulting in partial disability for work . . . the compensation to be paid shall be 66 2/3 percent of the difference between the wages received by the injured employee before the injury and *the earning power of the employee* thereafter. . . . This compensation shall be paid during the period of such partial disability for work, not, however, beyond 300 weeks.[14]

Accordingly, Daisy was required to prove that Campos had no decrease in earning power following his workplace injury in order to avoid owing Campos partial disability benefit payments under § 2325.[15]

---

[12] *Id.* (citing <u>Waddell v. Chrysler Corp.</u>, 1983 WL 413321, at *3 (Del. Super. June 7, 1983)).
[13] 19 *Del. C.* § 2325.
[14] *Id.* (emphasis added).
[15] *See, e.g.*, *Ham v. Chrysler Corp.*, 231 A.2d 258, 262 (Del. 1967); *Allen v. Megee Plumbing & Heating*, 1996 WL 453351, at *3 (Del. Super. Jul. 25, 1996).

7

In determining an employee's "earning power" following an injury, Delaware courts are authorized to consider other relevant factors in addition to those that are related to the claimant's injury, including the claimant's age, education, general background, occupational and general experience, the nature of the work that can be performed by a worker with the physical impairment, and the availability of that work.[16] These factors, in other words, indicate that the worker must be taken as he was hired, and that, for example, a general laborer whose workplace injury has rendered him unemployable or unable to perform heavy physical labor could not be denied benefits because accounting jobs are there for the taking.

Previous decisions have emphasized that the availability of work for the claimant is a primary factor in the disability determination, and an employer cannot meet its burden of proving that the worker is not entitled to partial disability payments without showing that jobs are available to the claimant, in his restricted state, at his pre-injury wage rate.[17] In order to prove that the employee is not partially disabled, the employer must establish that the employee is actually able to obtain a job given his particular circumstances. As the Superior Court explained:

---

[16] *Id.*

[17] *See Waddell v. Chrysler Corp.*, 1983 WL 413321, at *3 (Del. Super. June 7, 1983) ("[T]he employer, . . . if he is to defeat the worker's entitlement to be paid compensation for partial incapacity to earn, must assure that the evidence of record establishes as more probable than not that the partial work-related physical disability the worker still suffers is not causing an unavailability to him of remunerative work in the marketplace that eliminates such wage loss to the worker as would justify paying him some amount of worker's compensation.") (internal citation omitted); *Abex Corp. v. Brinkley*, 252 A.2d 552, 553 (Del. Super. 1969).

> Common sense and everyday experience tells us that a person with given physical disabilities may be physically capable of performing certain "available" work, but because of his disability may be unacceptable to an employer and thus unable to secure such work. . . . *Jobs must be realistically "within reach" of the disabled person. . . . A showing of physical ability to perform certain appropriate jobs and general availability of such jobs is . . . an insufficient showing of the availability of said jobs to a particular claimant.*[18]

This Court has further clarified that "[a] workman may be totally disabled economically, and within the meaning of the Workmen's Compensation Law, although only partially disabled physically. In this connection, inability to secure work, if causally connected to the injury, is as important a factor as the inability to work."[19]

In this case, the Superior Court accepted the Board's finding that Campos was not disabled economically because light duty jobs were available. To be more precise, the Superior Court accepted that Campos was not disabled economically because light duty jobs at Daisy itself were available to him. Daisy presented no other evidence of job availability.

We do not agree that Daisy's offer of a job to Campos constituted sufficient proof of job availability. Consistent with federal law, Daisy could only hire Campos if he could present authorization to work, which he cannot do. The record thus establishes that a job at Daisy was not in fact available to Campos, who does not have a valid social security card. Thus, Daisy's offer to re-hire him was not a bona fide offer.[20]

---

[18] *Abex*, 252 A.2d at 553.

[19] *Ham*, 231 A.2d at 261.

[20] *Gonzalez v. Performance Painting, Inc.*, 258 P.3d 1098, 1106 (N.M. Ct. App. 2011) ("Where the pre-injury employer knew or should have known of the injured worker's undocumented

9

We have previously found this type of "theoretically available" argument to be unavailing for employers seeking to meet their burden to terminate benefits under the Workers' Compensation Act. In *Johnson Controls, Inc. v. Fields*, an employer sought to terminate an employee's total disability benefits after firing him for insubordination.[21] The Board granted the employer's petition, reasoning that, but for the employee's misconduct, the employee would have been able to work for the employer, and thus, the employee did not have diminished earning capacity. The Superior Court's decision to reverse, which we affirmed, determined that the employer could not "transfer the legislatively determined process for the payment of workers' compensation" by firing the employee.[22]

Similarly, Daisy cannot avoid the legislatively determined process for evaluating whether an employee is partially disabled. The Workers' Compensation Act provides that employees who have suffered a loss in earning power following a workplace injury are entitled to benefits, and this inquiry requires consideration of the employee's individual circumstances. The employer who seeks to terminate benefits also bears the burden to prove that jobs are actually available – *i.e.*, "within reach" – of the injured employee.

status, the employer cannot make a bona fide rehire offer. An offer as contemplated [in the Workers' Compensation Act] by a pre-injury employer to rehire an injured, undocumented worker would in that instance be illusory. . . ."), *rev'd on other grounds*, 303 P.3d 802, 803 (N.M. 2013) ("Because an offer to rehire must be a legitimate offer, we hold that employers who cannot demonstrate such good faith compliance with federal law in the hiring process cannot use their workers' undocumented status as a defense to continue payment of modifier benefits under the Workers' Compensation Act.").

[21] 758 A.2d 506 (Del. 2000).

[22] *Id.* at 509-10.

The record shows that Campos' permanently impaired shoulder prevents him from engaging in heavy-duty work. He will never recover fully. And because Daisy investigated Campos' immigration status in connection with his claim for benefits, at the request of its workers' compensation insurance carrier, and discovered that Campos social security card was invalid, Daisy is now unwilling to employ him.

Daisy does not dispute these facts, nor did it provide any evidence that Campos is able to find work elsewhere.[23] For these reasons, Daisy did not meet its burden of showing that Campos is not partially disabled under the Workers' Compensation Act.

As Daisy points out, federal restrictions prevent it from re-hiring Campos.[24] But Daisy's carrier's focused investigation and other facts of record could be viewed by a rational mind as suggesting that Daisy may have harbored concerns about Campos' immigration status before his injury.

In light of Campos' inability to secure new work legally, Daisy may find it difficult to demonstrate job availability, as a labor market survey or some other form of

---

[23] This case can therefore be distinguished from *Torres v. Allen Family Foods*, 672 A.2d 26 (Del. 1995), where the employer retained a vocational rehabilitation specialist who provided the claimant with a number of unsuccessful job leads, and later conducted a labor market survey in order to identify jobs that were available to someone with the employee's qualifications and limitations. When the employer sought to terminate the claimant's benefits, it provided the results of the labor market survey to the Board. *Id.* at 29. By contrast, Daisy's only proof was its own testimony that jobs at Daisy were open to Campos if he could find working papers.

[24] Under the IRCA, it is illegal for an employer "to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien." 8 U.S.C. § 1324a(a)(1). Employers who fail to comply with the statutory requirements for hiring, verification, and firing are subject to sanctions. *See* 8 U.S.C. §§ 1324a(e)(4-5), (f).

proof may not identify jobs that are actually available to Campos.[25]  But any difficulty in proving job availability is properly borne by the employer, who must take the worker as it hired him.[26]  We thus hold that if Daisy cannot prove by reliable evidence that jobs are in fact available to Campos as an injured undocumented worker, then Daisy must continue to pay partial disability benefits until it shows that Campos has been re-employed.[27] Once it determines that Campos has found new employment, Daisy can seek to prove that he does not have decreased earning power by comparing his new wage with his pre-injury wage in a hearing before the Board.

Our decision to interpret § 2325 in this manner under these circumstances is driven by several factors.  First and most important, this interpretation is the one most faithful to the Workers' Compensation Act, as reflected in its plain terms and the judicial precedent applying the Act over many decades.  Second, by ensuring that undocumented

---

[25] *See, e.g.*, *Cenvill Dev. Corp. v. Candelo*, 478 So. 2d 1168, 1170 (Fla. Dist. Ct. App. 1985) ("[W]here the claimant may not legally be employed, a work search, no matter how exhaustive, will not adequately demonstrate [that his injury has not precluded him from finding a job]."); *Rivera v. United Masonry, Inc.*, 948 F.2d 774, 776 (D.C. Cir. 1991) ("Of course, it is a legal fiction that an undocumented alien cannot get any jobs; between applicant willingness to conceal, and employer inability or unwillingness to detect undocumented status, hirings occur. But there is good reason for maintaining the legal fiction.  If the [Board] pierced the fiction, it would presumably have to allow employers to rebut the claim of permanent total disability by proving the availability of jobs actually open to undocumented aliens. But this would be extremely burdensome to the employer.  As no one freely admits hiring undocumented aliens, the employer would have to employ testers or other ruses to make its showing.").

[26] *See Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1072 (9th Cir. 2004) ("[E]mployers have a perverse incentive to ignore immigration laws at the time of hiring but insist upon their enforcement when their employees complain.").

[27] Campos' attorney conceded at oral argument that Campos would likely work again.  *See e.g.*, *Gonzalez*, 303 P.3d at 806 ("Whether lawful or not, men and women like Worker in this case often do find employment somewhere, and when they do, modifier benefits can be terminated in the manner prescribed by the [Workers' Compensation Act].").

12

workers are given equal treatment under the Workers' Compensation Act, this interpretation reduces the incentive for employers to hire undocumented workers, and thus minimizes the overall incentive for illegal immigration, which is the primary goal of federal immigration law. Third and finally, this reading of the Act ensures that all workers in Delaware are not exposed to excessive risk because employers are required to bear the full cost of operating an unsafe workplace.

## A. The Purposes Of The Workers' Compensation Act Are Best Advanced By Holding Daisy To Its Statutory Burden To Prove That Campos Has Jobs Available To Him.

For many years, the Workers' Compensation Act has been interpreted to require an employer to show that a partially disabled worker has work available to him, in light of his particular characteristics, before his benefits are terminated.[28] And we recently recognized that Workers' Compensation Act requirements apply equally to documented and undocumented workers.

In *Ramirez*, we affirmed the Superior Court's holding that an employee who supplied a false social security number and was later deported was entitled to continued payment of total disability benefits, and that his illegal status "[did] not remove him from coverage for job related injuries."[29] *Ramirez* relied on the plain language of the Workers' Compensation Act to reach this conclusion. Because the employer had not met any of the

---

[28] *See, e.g.*, *Johnson Controls, Inc. v. Fields*, 758 A.2d 506 (Del. 2000); *Ham v. Chrysler Corp.*, 231 A.2d 258 (Del. 1967); *Allen v. Megee Plumbing & Heating*, 1996 WL 453351 (Del. Super. Jul. 25, 1996); *Waddell v. Chrysler Corp.*, 1983 WL 413321 (Del. Super. Jun. 7, 1983); *Abex Corp. v. Brinkley*, 252 A.2d 552 (Del. Super. 1969).
[29] *Del. Valley Field Servs. v. Ramirez*, 2012 WL 8261599, *1 (Del. Super. Sept. 13, 2012).

13

statutory bases for the suspension of benefits, the Superior Court affirmed the Board's

refusal to terminate Ramirez' benefits.[30] We held that this ruling was proper.[31] The

decision in *Ramirez* accords with the case law in the majority of other states that have

confronted similar situations.[32]

---

[30] *Id.*

[31] *Del. Valley Field Servs. v. Ramirez*, 61 A.3d 617 (Del. 2013).

[32] *See e.g.*, *Champion Auto Body v. Indus. Claim Appeals Office of Colo.*, 950 P.2d 671, 673 (Colo. Ct. App. 1997) (holding that provisions barring employers from hiring undocumented workers did not create a legal disability that precluded the claimant from proving entitlement to temporary disability benefits because the IRCA did not prohibit the claimant from entering into an employment contract); *Dowling v. Slotnik*, 712 A.2d 396, 404 (Conn. 1998) (concluding that undocumented workers are included in the group of "persons" who are eligible for workers' compensation); *Safeharbor Emp. Servs. I, Inc. v. Cinto Velazquez*, 860 So. 2d 984, 986 (Fla. Dist. Ct. App. 2003) (holding that workers' compensation claimant's status as an undocumented worker did not preclude him from receiving benefits); *Sanchez v. Eagle Alloy Inc.*, 658 N.W.2d 510 (Mich. App. 2003) (recognizing that undocumented workers are "employees" under the definition provided by the Worker's Disability Compensation Act); *Mendoza v. Monmouth Recycling Corp.*, 672 A.2d 221 (N.J. Super. 1996) (holding that an undocumented worker who was injured on the job was entitled to workers' compensation benefits, as providing the employer with immunity from payment of compensation to undocumented workers would provide a disincentive to ensure workplace safety); *Amoah v. Mallah Management, LLC*, 866 N.Y.S.2d 797, 800 (App. Div. 2008) (holding that the status of an injured worker as an undocumented worker does not prohibit an award of workers' compensation benefits or recovery for lost earnings in a personal injury action predicated on state labor law); *Del Taco v. Workers' Comp. Appeals Bd.*, 94 Cal. Rptr. 2d 825, 828 (Cal. Ct. App. 2000) (holding that a worker's immigration status did not affect his entitlement to temporary disability payments).

  Some states have found that where the workers' compensation statute requires a demonstration of working capacity (or lack thereof) in order to award benefits, the employer is required to make this showing before terminating benefits awarded to an undocumented worker. Depending on the statutory requirements, proof of earning capacity may or may not take the claimant's immigration status into account. *See Gayton v. Gage Carolina Metals Inc.*, 560 S.E.2d 870, 874 (N.C. App. 2002) (holding that it is the employer's burden to produce sufficient evidence that the there are suitable jobs that the plaintiff could secure, "but for" his immigration status, and that the absence of such evidence supported the North Carolina Industrial Commission's finding that the employer had failed to establish that the employee was able to return to work); *Correa v. Waymouth Farms, Inc.*, 664 N.W.2d 324, 329 (Minn. 2003); *Ruiz v. Belk Masonry Co.*, 559 S.E.2d 249, 251 (N.C. App. 2002); *Hernandez v. SAIF Corp.* 35 P.3d 1099, 1101 (Or. App. 2001).

  At least one state has excused an employer from demonstrating job availability for an undocumented worker, holding that medical evidence of a change in condition is all that is

Daisy now asks us to affirm the Superior Court's termination of partial disability benefits based on a showing that would be insufficient to terminate partial disability benefits granted to a legal employee. Under *Johnson Controls*, an employer cannot rely on its own testimony that it would be willing to hire an employee with the same disability in the abstract as proof of job availability. Rather, if the employer wants to point to a job at its own workplace for the claimant, it must actually be willing to allow the claimant to occupy the job.

Were we to decide this case differently, the playbook for employers wishing to reduce their labor costs by exploiting workers is simple. Turn a blind eye when hiring and enjoy employing workers reluctant to complain about low pay or workplace conditions.[33] And, if one of these employees is injured, then, and only then, verify that

---

required. *See, e.g.*, *Reinforced Earth Co. v. W.C.A.B.*, 810 A.2d 99, 108 (Pa. 2002); *Morris Painting v. W.C.A.B.*, 814 A.2d 879, 883 (Pa. Commw. Ct. 2003).

[33] "Undocumented immigrants have lower median household incomes than legal immigrants and U.S.-born citizens, despite having more workers per household on average (1.75) than U.S.-born households (1.23). In 2007, the median annual household income of undocumented immigrants was $36,000, compared with $50,000 for people born in the U.S. The median household income of undocumented immigrants remains largely unchanged even after they have been in the U.S. for more than a decade." Michael K. Gusmano, *Undocumented Immigrants in the United States: Demographics and Socioeconomic Status*, Hastings Center Issue Brief (Feb. 14, 2012), *available at* http://www.undocumentedpatients.org/issuebrief/demographics-and-socioeconomic-status/; *see also* Beth Lyon, *When More "Security" Equals Less Workplace Safety: Reconsidering U.S. Laws that Disadvantage Unauthorized Workers*, 6 U. PA. J. LAB. & EMP. L. 571, 593-94 (2004) ("Unauthorized workers are less likely to pursue their employment rights for fear of deportation, and enjoy scant, if any, social welfare programming if they lose their jobs. Many of them are supporting large families in their countries and are highly motivated to work in adverse conditions. Injured unauthorized workers are more likely to 'work hurt,' or to continue working despite an injury, for fear of losing their jobs by enforcing their right to workers' compensation. The congressional report underlying the 1986 employer sanctions law affirmed that 'out of desperation, immigrants will work in substandard conditions and for starvation wages,' and urged that employment protection laws be enforced to protect this class of worker. Thus,

employee's immigration status. When met with a demand for benefits, generously offer to re-hire the worker once he gets proper immigration status. Consistent with *Ramirez* and the well-reasoned decisions of other courts that have confronted similar situations, we decline to endorse this blueprint for the denial of benefits.[34]

Holding Daisy to its statutory burden to show that Campos has employment available to him is the result most consistent with the goals of the Workers' Compensation Act, which was designed "to give an injured employee . . . a prompt and sure means of receiving compensation and medical care without subjecting him[] to the hazards and delays of a law suit."[35] When Campos received benefits under the Act, he gave up his right to sue Daisy in tort for permanently disabling him. If we were to now find that Daisy could terminate his benefits without making a proper demonstration of job availability as required by § 2325, we would leave Campos with no recourse following his disabling workplace injury.

At oral argument, Daisy contended that allowing Campos to collect partial disability benefits would allow him to receive a windfall because of his status as an undocumented worker. We disagree. Because of his workplace injury, Campos has a

employers of all types have an immediate economic incentive to employ unauthorized workers, one which outweighs the remote possibility of administrative sanctions that are rarely enforced.") (internal citations omitted).

[34] *See Gonzalez*, 303 P.3d at 807 ("In addition, refusing modifier benefits to undocumented workers across the board would give rise to other problems. It would create a perverse incentive for employers to *hire* undocumented workers over other workers, especially in high-risk jobs that often result in workers' compensation claims. An employer could hire undocumented workers, knowing that in the event of injury the employer would likely pay a much lower amount in workers' compensation benefits due to ineligibility for modifier benefits. This would again upset the balance the Legislature created in the [Workers' Compensation Act].").

[35] *Frank C. Sparks Co. v. Huber Baking Co.*, 96 A.2d 456, 461 (Del. 1953).

16

permanently impaired shoulder.  He is not legally allowed to work in the United States and faces the risk of deportation by seeking a new job.  He cannot sue Daisy in tort, nor is he likely to recover any of the FICA taxes that were paid on his behalf and were effectively part of his wage.[36]  It is doubtful, therefore, that Campos will perceive himself as receiving any windfall from his workplace injury.

Moreover, Daisy can properly petition the Board to terminate Campos' benefit payments once it establishes that Campos has not suffered a loss in earning power. Allowing Daisy to avoid making payments that would otherwise be required under the Workers' Compensation Act would award Daisy itself a windfall for hiring an undocumented worker and, only after he became injured, claiming that it was obligated to comply with federal law regulating an employer's duty to verify proper work eligibility.

## B.  Requiring Daisy To Show That Jobs Are Available To Campos Will Increase Incentives For Employers To Honor Federal Immigration Law.

Embracing Daisy's position would encourage employers to relax their hiring practices and employ undocumented workers, which would ultimately heighten, not dampen, illegal immigration.  It is easy to see why.  Our nation is proud to be one of immigrants.[37]  Most of our forebearers originally came here at great risk and emotional

---

[36] Undocumented workers pay "a significant share of their income in state and local taxes . . . [and are] collectively paying an estimated $10.6 billion in 2010 with contributions ranging from less than $2 million in Montana to more than $2.2 billion in California.  This means these families are likely paying about 6.4 percent on average of their income in state and local taxes." Institute on Taxation and Economic Policy, Undocumented Immigrants' State and Local Tax Contributions (July 2013), available at http://www.itep.org/pdf/undocumentedtaxes.pdf.

[37] *See, e.g.*, *Foley v. Connelle*, 435 U.S. 291, 294 (1978) ("As a Nation we exhibit extraordinary hospitality to those who come to our country, which is not surprising for we have often been described as 'a nation of immigrants.'") (internal quotation omitted); W. COLE DURHAM &

17

cost to pursue a better life and feed their families.  We venture that most undocumented

workers do not lightly leave their homeland and families for relatively low wage jobs in

the United States.  As de Tocqueville observed, "[t]he happy and powerful do not go into

exile. . . ." [38]  They typically do so because of necessity, and in almost all cases, because

they cannot provide their families with what many Americans take for granted.  Without

endorsing a worker's decision to seek employment in the United States without proper

immigration status, we also note the obvious and important reality: the employment

relationship takes two.[39]  Absent a willingness by comparatively better resourced and less

---

ROBERT SMITH, 4 RELIGIOUS ORGANIZATIONS AND THE LAW § 16:2  ("The United States is famously a nation of immigrants. All Americans, with the exception of the Native Americans, are at most within a few hundred years of being from another land."); Ronald Reagan, Statement on the United States Immigration and Refugee Policy (July 30, 1981) ("Our nation is a nation of immigrants.  More than any other country, our strength comes from our own immigrant heritage and our capacity to welcome those from other lands. . . .  Illegal immigrants in considerable numbers have become productive members of our society and are a basic part of our work force. Those who have established equities in the United States should be recognized and accorded legal status.  At the same time, in so doing, we must not encourage illegal immigration."); George Bush, Remarks on Signing the Immigration Act of 1990 ("Nearly all Americans have ancestors who braved the oceans – liberty-loving risk takers in search of an ideal – the largest voluntary migrations in recorded history. . . .  Immigration is not just a link to America's past; it's also a bridge to America's future."); Franklin D. Roosevelt, Remarks Before the Daughters of the American Revolution (1939) ("Remember, remember always, that all of us, you and I especially, are descended from immigrants and revolutionists."); Abraham Lincoln, Letter to Joshua Speed (August 24, 1855) (discussing Lincoln's vigorous opposition to the Know-Nothing party and his embrace of new Americans  as fellows entitled to the full range of rights Jefferson articulated in the Declaration of Independence); George Washington, Letter to Reverend Francis Adrian Vanderkemp (May 28, 1788) ("I had always hoped that this land might become a safe and agreeable asylum to the virtuous and persecuted part of mankind, to whatever nation they might belong.").

[38] ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 29 (Henry Reeve trans., Colonial Press 1900).

[39] Accordingly, the IRCA places requirements on both the employer and the employee to ensure compliance with immigration law, even though the Act only criminalizes the hiring or recruitment of the employee.  *See* § 1324a(a)(1) ("It is unlawful for a person or other entity to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the

vulnerable employers to hire workers whose immigration status they do not verify, illegal immigration would slow considerably, as the economic reward of jobs would be less available.[40]

Placing the burden of proving job availability on employers of undocumented workers following a workplace injury is thus most consistent with the purpose of the IRCA itself. The IRCA seeks to "close the back door on illegal immigration" through the use of employer sanctions, which Congress determined was the "most humane, credible and effective way to respond to the large-scale influx of undocumented aliens."[41]

If we accept Daisy's position and excuse employers from paying partial disability benefits to undocumented workers, employers' economic incentives to hire

---

alien is an unauthorized alien . . . with respect to such employment, or to hire for employment in the United States an individual without complying with the requirements of subsection (b) of this section."). As discussed, the employer must verify the employee's documentation under § 1324a(b). At the same time, in accordance with § 1324a(b)(2), the individual worker must also attest, under penalty of perjury, "that the individual is a citizen or national of the United States, an alien lawfully admitted for permanent residence, or an alien who is authorized under this chapter or by the Attorney General to be hired, recruited, or referred for such employment." The IRCA also criminalizes the creation or use of forged documents in § 1324c(a).

[40] "Many undocumented immigrants came to the United States to find work. Among undocumented immigrants who are men aged 18-64, 98% were part of the paid workforce in 2008." Gusmano, *supra* note 33.

When signing the IRCA into law, President Reagan described a provision sanctioning employers for hiring undocumented workers as "the keystone" of the IRCA: "It will remove the incentive for illegal immigration by eliminating the job opportunities which draw illegal aliens here." Robert Pear, *President Signs Landmark Bill on Immigration*, NEW YORK TIMES (November 7, 1986), *available at*: http://www.nytimes.com/1986/11/07/us/president-signs-landmark-bill-on-immigration.html.

[41] H.R. REP. NO. 99-682(I), at 46 (1986). The focus of the IRCA is on preventing employers from hiring unauthorized aliens. As written, the IRCA does not prohibit unauthorized aliens from seeking or accepting employment in the United States. And the IRCA does not "undermine or diminish in any way labor protections in existing law, or . . . limit the powers of federal or state labor relations boards . . . to remedy unfair practices committed against undocumented employees." H.R. REP. NO. 99–682, at 58 (1986).

19

undocumented workers instead of legal ones, especially for high-risk jobs (such as those in the construction industry), will increase.[42] As the Superior Court explained in *Ramirez*, denying undocumented workers equal treatment under the Workers' Compensation Act would "contravene the purpose of the [IRCA] by creating a financial incentive for unscrupulous employers to hire undocumented workers."[43] Stated more positively, under the interpretation of the Workers' Compensation Act in *Ramirez* and adhered to in this opinion, strong incentives are created for scrupulous compliance by employers with federal immigration law in the first instance.[44]

---

[42] *See, e.g.*, *Gonzalez*, 303 P.3d at 807 ("In addition, refusing modifier benefits to undocumented workers across the board would give rise to other problems. It would create a perverse incentive for employers to *hire* undocumented workers over other workers, especially in high-risk jobs that often result in workers' compensation claims. An employer could hire undocumented workers, knowing that in the event of injury the employer would likely pay a much lower amount in workers' compensation benefits due to ineligibility for modifier benefits. This would again upset the balance the Legislature created in the [Workers' Compensation Act].").

[43] *Ramirez*, 2012 WL 8261599, at *8; *see also Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 155 (2003) (Breyer, J., dissenting) ("[T]he general purpose of the [IRCA's] employment prohibition is to diminish the attractive force of employment, which like a 'magnet' pulls illegal immigrants toward the United States."); *Mendoza*, 672 A.2d at 225 ("[I]mmunity from accountability [under the Workers' Compensation Act] might well have the further undesirable effect of encouraging employers to hire illegal aliens in contravention of the provisions and policies [of the IRCA]."); *Montoya v. Gateway Ins. Co.*, 401 A.2d 1102 (N.J. Super. 1979) (holding that potential employers may be encouraged to employ undocumented workers if such workers are unable to lodge claims based on injuries sustained).

[44] Our holding is unlikely to create perverse incentives for Campos, the more economically vulnerable party in this case, or other undocumented workers who suffer workplace injuries. It is unlikely that Campos would be deterred from seeking a new job by the prospect of receiving 66% of his previous wages for 300 weeks. Assuming Campos was earning the minimum wage, $7.75, and worked 40 hours per week, his total benefit entitlement over six years would be approximately $60,000. This is not enough for a thirty-year-old man like him to survive on for the next six years, let alone the remainder of his life. Moreover, our holding could not be expected to encourage immigrants to enter the country illegally. As the Superior Court explained in *Ramirez*, "potential eligibility for workers' compensation benefits in the event of a work-related injury realistically cannot be described as an incentive for undocumented aliens to enter this country illegally." *Ramirez*, 2012 WL 8261599, at *8; *see also Patel v. Quality Inn*

20

We need not decide today what result would pertain in a different factual scenario, where the employer was able to demonstrate that it had a uniformly applied policy of scrupulously verifying the immigration status of the workers it employs, using the E-Verify system or other responsible means, and, despite proof that the employer had used these means when hiring the claimant, it somehow hired the claimant despite his undocumented status.[45] In that circumstance, the burden of proving job availability under § 2325 might be properly shifted to the undocumented employee, consistent with the IRCA. Under § 1324a(a)(3), the employer has an opportunity to make out an affirmative defense: "[a] person or entity that establishes that it has complied in good faith with the requirements of . . . hiring, recruiting, or referral for employment of an alien in the United States has established an affirmative defense. . . ." Alternatively, when faced with that situation, it may be that the employer should continue to bear the burden of persuasion to show availability, but that the claimant's status as an undocumented worker should be disregarded. The question of whether and which approach to take should be answered

---

*South*, 846 F.2d 700, 704 (11th Cir. 1988) (holding that aliens enter the country "in the hope of getting a job," not gaining "the protection of our labor laws"). Indeed, as we have explained, what will increase illegal immigration is to reward employers who employ undocumented workers and thereby lower the overall costs they incur for worker pay, benefits, and safety precautions.

[45] *See, e.g.*, *Gonzalez*, 303 P.3d at 807 ("We agree that fairness should prevail on behalf of [a careful] employer, so long as the employer can show he did the best he could under the circumstances to avoid the predicament. In other situations, however, where the employer is culpable for improperly hiring the worker in the first place, the worker should not shoulder all the responsibility. . . . Whether an employer knew or should have known, before the worker was injured, that a worker was undocumented determines whether an employer's rehire offer was legitimate and should be the focus of our inquiry and the basis of determining whether the injured worker is entitled to modifier benefits.").

21

after full briefing in a case where the facts warrant making those decisions. But this is not such a case.[46]

And it is perhaps unsurprising that we have not been able to find a case that deals with that factual scenario. The reason is simple: if an employer uniformly checks the documents provided by applicants using the E-Verify system, for example, it will typically not hire the undocumented worker in the first instance.

### C. Requiring Employers To Show Job Availability Will Best Protect The Safety Of All Delaware Workers.

Finally and of importance to all who work in Delaware, our holding also best promotes one of the purposes of the Workers' Compensation Act: "to foster a workplace safe for *all* workers."[47] "Because the Act was intended to benefit injured workers, our courts construe it liberally, and resolve any reasonable doubts in favor of the worker."[48] If we were to allow employers to avoid paying partial disability benefits to

---

[46] The record indicates that Daisy did not engage in the effort required under § 1324a(a)(3) of the IRCA. At no time has Daisy availed itself of this affirmative defense and contended that it complied with IRCA, and it is undisputed that it did not use the E-Verify system when it was available. Daisy never presented any evidence that Campos' social security card "reasonably appear[ed] on its face to be genuine," per § 1324a(b)(1)(A); that Daisy required Campos to attest that it was, per § 1324a(b)(2); or that it required Campos to provide a driver's license or other similar documentation to corroborate his social security card, per § 1324a(b)(1)(A)(ii). Daisy has not argued that it used any other reasonable means to verify the documents provided by applicants, and, as we point out, Daisy admitted that it has hired undocumented workers on other occasions, and that it has not used the E-Verify system to check the documents provided by the workers it hired before Daisy began using the E-Verify system, even though continuing to employ unauthorized aliens is also a violation of the IRCA. 8 U.S.C. § 1324a(a)(2). Daisy "did not do the best it could under the circumstances to avoid the predicament." *Gonzalez*, 303 P.3d at 807. Accordingly, the "worker should not shoulder all the responsibility." *Id.*

[47] *Ramirez*, 2012 WL 8261599, at *5 (emphasis added); *see also* 19 *Del. C.* § 2379 ("The safety of Delaware workers is of paramount importance to the General Assembly.").

[48] *Estate of Watts v. Blue Hen Insulation*, 902 A.2d 1079, 1081 (Del. 2006) (internal citation omitted).

22

undocumented employees, we would lower the expected cost to employers of workplace injuries, and thus encourage employers to relax workplace safety requirements.[49] Accordingly, workplace safety for *all* workers would suffer. This is a genuine concern because undocumented workers make up a large part of the workforce in high-risk industries where the need for prudent safety measures is more, not less, important.[50]

[49] *See, e.g.*, GUIDO CALABRESI, THE COST OF ACCIDENTS 73 (1970) (contending that reducing the costs associated with dangerous activities increases their incidence); JAMES ROBERT CHELIUS, WORKPLACE SAFETY AND HEALTH: THE ROLE OF WORKERS' COMPENSATION 10 (1997) ("[The workers' compensation system] serves the goal of encouraging an appropriate amount of safety and health."); Lyon, *supra* note 33 at 605-07 ("Excluding unauthorized workers from workers' compensation coverage makes all workers more vulnerable to workplace injury and fatalities. Workplace injuries and fatalities are of serious concern in the United States, and workers' compensation is an important public policy tools in place to improve workplace safety. . . . It is widely recognized that liability for workers' compensation provides a direct economic incentive to employers to improve safety conditions – fewer and lower claims mean lower insurance premiums for employers. . . . Tying the fact that unauthorized workers are over-represented in unsafe workplaces further heightens the importance of including this category of workers in workers' compensation regimes. U.S. workers sharing workspace with unauthorized workers are exposed to greater risk to the extent that unauthorized workers are shut out of workers' compensation systems."); *see also Mendoza v. Monmouth Recycling Corp.*, 672 A.2d 221 (N.J. Super. 1996) (finding that providing an employer with immunity from payment of workers' compensation to undocumented workers would provide a disincentive to ensure workplace safety); *Rajeh v. Steel City Corp.*, 813 N.E.2d 697, 731 (Ohio 2004) (holding that public policy supports allowing undocumented workers to collect workers' compensation because, if not, "underhanded" employers may become lax in workplace safety, knowing they would suffer no consequences if their undocumented employees were injured at work).

[50] *See* Gusmano, *supra* note 33 ("Undocumented immigrants make up 25% of farm workers, 19% of building, grounds-keeping, and maintenance workers, 17% of construction workers, and 12% of food preparation and service workers and make up 5.2% of the paid work force in the U.S."); Lyon, *supra* note 33, at 583 ("The industries with the highest concentration of unauthorized workers include low-wage industries such as agriculture, food processing, construction, garment manufacturing, food service, hotels, and landscaping. Construction, agriculture, and manufacturing have the first, third, and fifth highest number of fatalities respectively of all U.S. industries."); General Accounting Office, Garment Industry: Efforts to Address the Prevalence and Conditions of Sweatshops 8 (GAO/HEHS–95–29, Nov. 1994) (noting a higher incidence of labor violations in areas with large populations of undocumented workers).

## IV. CONCLUSION

For the foregoing reasons, the judgment of the Superior Court is hereby REVERSED. This matter is remanded to the Superior Court for remand to the Board and a new hearing in accordance with this opinion.